United States District Court
Southern District of Texas

**ENTERED**
January 31, 2022
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| BRIAN K. HERINGTON, | § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. H-20-3252 |
| UNIVAR, INC. *et al.*, | § § § | |
| Defendants. | § | |

### MEMORANDUM AND OPINION

On Day 1, a high-level and well-paid executive employee of a public company, whose work was clearly at will, tells his company's chief executive officer that he will be "tendering resignation tomorrow," and that his last day will be 3 weeks and 1 day later.  On Day 2, the CEO responds and says "your final day will be sooner rather than later."  Later on Day 2, the executive sends his resignation letter, stating that his last day will be 3 weeks and 1 day later and that he will be accepting a CEO role with another company.  Minutes later, the CEO "acknowledged and accepted" the resignation and said that human resources will be in touch.  Still on Day 2, the human resources representative "reaches out" and tells the executive that "your last day is tomorrow." The company agrees to retain insurance for 30 days, to pay outstanding receipts requiring reimbursement, and arranged for the return or sale of various company owned devices.  The executive does no more work for the company, and the company asks for none, explaining later that the job did not lend itself to lame-duck work.  The employee goes on to his next job, for which he signed a contract on Day 2.

The parties had signed a Severance Agreement.  The Agreement states that either could terminate the employment at any time, with or without "Cause" or "Good Reason," and without

advance notice, subject to "Termination Entitlements."  Those "entitlements" included a large

lump-sum severance, payable only if the company terminated the executive's employment "other

than for Cause" or if the executive terminated the employment "for Good Reason in the absence

of Cause."  The issue is whether the executive resigned or was terminated "other than for Cause."

The executive contends that he was "terminated without Cause" when the company accepted his

resignation but made it effective as of the next day rather than the three-week-later date the

executive had proposed when he resigned.  The executive wants the $850,000 severance that he

was not entitled to or expecting to receive when he gave his notice of voluntary resignation, for

the three additional weeks he expected to, but did not, work.  The company denies that it terminated

the executive's employment without cause when it accepted his voluntary resignation but made it

effective immediately rather than on the timetable the employee had proposed.  Illinois law

governs, but Illinois law does not resolve the dispute.

One more complication arises.  The company required the executive to sign a release in

order to receive post-termination payments.  The executive signed the release, but after the dispute

over the severance arose.  The company asserts waiver and release of any right to payment (which

it denies).  The executive responds that he was simply complying with the conditions for payment

(agreeing that it was disputed).

The executive moves for summary judgment, arguing that the company terminated him

without cause when it accepted his notice of resignation but made the effective date the following

day, three weeks before his desired effective resignation date.  (Docket Entry No. 44).  The

company has responded, and the executive has replied.  (Docket Entry Nos. 47, 55).  The company

cross-moved for summary judgment, arguing that the executive waived his right to bring this

lawsuit when he signed the release after the dispute over severance had arisen.  (Docket Entry No.

46).  The executive has responded, and the company has replied.  (Docket Entry Nos. 52, 54).

Based on the pleadings, the motions, the briefs, the record, and the applicable law, the court

denies the executive's motion for summary judgment, finding that the executive voluntarily

resigned.  The fact that the company did not accept the executive's preferred resignation-effective

date and instead, having no work for the executive to do as a lame duck, accepted his resignation

effective immediately, did not turn the resignation into a termination without cause that required

the company to pay an additional $850,000 in severance.   Because the executive is not entitled to

recover on this breach of contract claim, the company's summary judgment motion as to the release

is moot.

The facts and reasons for these rulings are set out below.

## I.      Background

Brian Herington worked as the senior vice-president and chief commercial officer for

Univar Solutions, a chemical distribution company, from its launch in March 2019 to August 2020.

(Docket Entry No. 5 at ¶ 7; Docket Entry No. 44-2 at 2; Docket Entry No. 44-7 at 3).  Herington

and Univar signed a Severance and Change in Control Agreement.  (Docket Entry No. 5 at ¶ 8).

Herington received a base pay increase in July 2019 from $460,000 to $500,000, and his Incentive

Plan target increased from 60 percent to 70 percent.  (Docket Entry No. 44-2 at 2).  Most of the

relevant facts are well documented in the summary judgment evidence and undisputed.

### A.      The Summary Judgment Record

In support of his motion, Herington submits the following summary judgment evidence:

- his own declaration, (Docket Entry No. 44-1);

- the Severance and Change in Control Agreement, (Docket Entry No. 44-2);

- email correspondence between David Jukes, Univar's president and chief executive officer, and Herington, dated August 27, 2020, (Docket Entry No. 44-3);

- email correspondence between Kimberly Dickens, Univar's chief people officer, and Herington, dated August 27, 2020, (Docket Entry No. 44-4);

- letter and enclosures from Harry W. Lipman, Esq., counsel for Herington, to Noelle Perkins, Esq., senior vice-president and general counsel, secretary, and chief risk officer for Univar, dated September 1, 2020, (Docket Entry No. 44-5);

- letter from William F. Dolan, counsel for Univar, to Harry W. Lipman, dated September 16, 2020, (Docket Entry No. 44-6); and

- excerpts of deposition testimony by Jukes and Dickens, (Docket Entry Nos. 44-7, 44-8).

In support of its response to Herington's summary judgment motion, Univar submits the following summary judgment evidence:

- a declaration by Kimberly Dickens, (Docket Entry No. 47-1 at 3–9);

- the Severance and Change in Control Agreement, (Docket Entry No. 47-1 at 10–20);

- Herington's August 27, 2020, resignation letter, (Docket Entry No. 47-1 at 21–22);

- email correspondence between Dickens and Herington dated August 27, 2020, (Docket Entry No. 47-1 at 23–25);

- Univar human resource records for Herington, (Docket Entry No. 47-1 at 26–27, 28–29);

- a declaration by William Dolan, (Docket Entry No. 47-1 at 30–31);

- Univar's Code Handbook, (Docket Entry No. 47-1 at 32–60);

- excerpts of deposition testimony by Jukes and Herington, (Docket Entry No. 47-1 at 61–89, 90–98); and

-  a declaration by Jukes, (Docket Entry No. 47-1 at 99–102).

In support of his reply to Univar's response, Herington submits the following summary judgment evidence:

- additional excerpts of deposition testimony by Jukes and Dickens, (Docket Entry Nos. 55-1, 55-2).

In support of its cross-motion for summary judgment, Univar submits the following summary judgment evidence:

- a declaration by William Dolan, (Docket Entry No. 46-2 at 2–4);

- the Severance and Change in Control Agreement, (Docket Entry No. 46-2 at 5–15);

- Herington's August 27, 2020, resignation letter, (Docket Entry No. 46-2 at 16–17);

- email correspondence between Dickens and Herington dated August 27, 2020, (Docket Entry No. 46-2 at 18–20);

- the release executed by Herington, (Docket Entry No. 46-2 at 21–23);

- excerpts of deposition testimony by Herington, (Docket Entry No. 46-2 at 24–34); and

- a September 1, 2020, demand letter from Harry Lipman, (Docket Entry No. 46-2 at 35–38).

In support of his response to Univar's cross-motion, Herington submits the following summary judgment evidence:

- a declaration by Herington, (Docket Entry No. 52-1 at 1–2);

- Univar's denials of Herington's severance claim, (Docket Entry No. 52-1 at 3–8);

- Herington's August 27, 2020, resignation letter, (Docket Entry No. 52-1 at 9–10);

- email correspondence between Dickens and Herington dated August 27, 2020, (Docket Entry No. 52-1 at 11–13); and

- Univar human resource records, (Docket Entry No. 52-1 at 14–17).

In support of its reply to Herington's response, Univar submits the following summary judgment evidence:

- a declaration by William Dolan, (Docket Entry No. 54-1 at 2–3); and

- Herington's handwritten notes, dated between August 26, 2020, and August 28, 2020, (Docket Entry No. 54-1 at 4–7).

## B.    Factual Background

Univar sells and distributes chemical products.  (Docket Entry No. 44-7 at 3).  Herington began working at Univar as the chief commercial officer and senior vice-president in March 2019, when the company launched.  (Docket Entry No. 5 at ¶ 7; Docket Entry No. 44 at 2; Docket Entry No. 47 at 2).  He worked a little over one year, until August 2020.  His position was a relatively new one.  Herington's job included building long-term relationships with Univar's customers, suppliers, and employees.  (Docket Entry No. 47-1 at 100–101).

The parties agree that the Severance and Change in Control Agreement recognized that Herington's employment was at will and terminable without notice by either Herington or Univar. (Docket Entry No. 44 at 2; Docket Entry No. 47 at 2).  Either party could terminate at any time, with or without "Cause" or "Good Reason," and "without advance notice," in writing, "subject to Section 3."  (Docket Entry No. 44 at 2; Docket Entry No. 44-2 at ¶ 2; Docket Entry No. 47 at 3). That section, titled "Termination Entitlements," provided a severance cushion for an executive who was terminated without cause or an executive who terminated his or her own employment with good reason.

Section 3 provided as follows:

> **3.1 By Univar with Cause or by Executive without Good Reason**.
> If Univar terminates Executive's employment for Cause (as defined below) or if Executive terminates Executive's employment without Good Reason (as defined below), Univar shall pay Executive any unpaid wages and unused accrued vacation earned through the termination date.
>
> **3.1.1** Cause," shall mean Executive's:
> (i) willful failure to perform material duties with respect to Univar (except where due to a physical or mental incapacity) which continues beyond fifteen (15) days after a written demand for performance of those duties is delivered to Executive by Univar;
> (ii) conviction of, plea of nolo contendere or any similar plea to
> > (A) the commission of a felony or any criminal offence that carries a maximum sentence of six (6) months or more;
> > (B) any misdemeanor that is a crime of moral turpitude;

(iii) gross negligence or willful or gross misconduct in connection with Executive's employment;

(iv) engaging in outrageous activity or in any activity or behavior that is in violation of Univar's code of conduct, as that may be in effect from time to time, where such activity or behavior is reasonably likely to cause material harm to Univar;

(v) breach of the non-competition, non-solicitation or confidentiality covenants to which Executive is subject; or

(vi) breach of any fiduciary duty.

In order to be "willful," Executive's action or inaction must be in bad faith or without reasonable belief that such action was in the best interests of Univar.  For purposes of this Agreement, Univar shall not treat the failure of Executive or Univar to achieve performance goals alone as creating Cause for termination of Executive's employment.

**3.1.2.** "Good Reason," shall mean:

(i) Subject to the requirements of Section 3.1.2(i), the occurrence of one or more of the following:

    (A) a material reduction in Executive's Base Salary (as defined below) or a material reduction in target annual incentive compensation opportunity, in each case other than a reduction which is applicable to all employees in the same salary grade as Executive;

    (B) a material diminution in Executive's title, duties or responsibilities; or

    (C) a transfer of Executive's primary workplace by more than 35 miles from Executive's current workplace.

(ii) None of the conditions described in Section 3.1.2(i) shall constitute Good Reason unless:

    (A) Executive provides notice to Univar of the condition claimed to constitute Good Reason within sixty (60) days of its existence;

    (B) Univar shall fail to have remedied the condition within thirty (30) days of Univar's receipt of the notice described in Section 3.1.2(ii)(A); and

    (C) Executive shall resign (giving appropriate written notice of termination) and terminate employment with Univar within thirty (30) days following the end of the thirty (30) day period described in Section 3.1.2(ii)(B).

For purposes of this Agreement, "Base Salary" shall mean the regular, periodic compensation paid to Executive, and shall not

include variable compensation, such as bonuses or equity-based compensation.

**3.2 By Univar other than for Cause or by Executive for Good Reason**.  If Univar terminates Executive's employment other than for Cause or if Executive terminates Executive's employment for Good Reason in the absence of Cause, Univar shall pay to Executive: . . . Unpaid wages and unused accrued vacation earned through the termination date; *plus* . . . A severance payment, payable in a lump sum payment not later than sixty (60) days following Executive's termination date, in an amount equal to the sum of (i) twelve months of Executive's Annual Base Salary plus (ii) 100% of the Target Bonus for the year in which Executive's employment terminates;

provided that Executive signs and delivers to Univar (and does not revoke) a release substantially in the form attached as Exhibit A (Illinois) (the "Release") within the time period specified in the Release . . . .

(Docket Entry No. 44-2 at ¶ 3) (emphasis in original).

Herington's Annual Base Salary as of July 2019 was $500,000, and his Target Bonus for 2020 was 70% of his Annual Base Salary ($350,000).  (Docket Entry No. 44-2 at 2).  If Section 3.2 of the Agreement applied, Herington would be entitled to a severance payment of $850,000.  (Docket Entry No. 44 at 2).

Section 12 of the Agreement provided that in "any litigation relating to the interpretation or enforcement of this Agreement, the prevailing party will be entitled to recoup the costs and attorneys' fees it incurs."  (Docket Entry No. 44-2 at ¶ 12).  And Section 17 of the Agreement provided that the "validity, construction and performance of this Agreement shall be governed by the laws of the State of Illinois."  (*Id.* at ¶ 17).

Herington produced blow-by-blow contemporaneous notes he took when he resigned and left Univar.  (Docket Entry No. 54-1 at 4–7).  The parties have produced the emails and letters they exchanged.  A summary is set out below.

8

**August 26, 2020**:  Herington had a video conference call at 10:30 a.m. Central Standard Time with Univar's president and chief executive officer, David Jukes, who was working in the United Kingdom and operating 6 hours later.  (Docket Entry No. 5 at ¶ 10; Docket Entry No. 47 at 4; Docket Entry No. 54-1 at 5).  Herington told Jukes that he would be resigning, that he would send a formal resignation letter the next day, and that his last day would be three weeks and one day later.  (Docket Entry No. 5 at ¶ 11; Docket Entry No. 44 at 2).  Dukes does not recall the three-weeks offer but does recall Herington offering transition services (which in Univar's judgment were neither needed nor helpful given the nature of Herington's position and his proposed lame-duck role).  (Docket Entry No. 47-1 at 94, 100–01).   At 5:52 p.m., Herington sent Duke an email that "laid out why I'm leaving."  (Docket Entry No. 54-1 at 5).

**August 27, 2020**:  At 1:58 a.m. Central Standard Time, Dukes responded to Herington and said that his final day would be "sooner rather than later."  (Docket Entry No. 47-1 at 75, 94; Docket Entry No. 54-1 at 5).  The parties recall discussing that they would agree on the date. (Docket Entry No. 47-1 at 76, 94).  After another brief email exchange, at 11:22 a.m., Herington signed the contract for his new CEO position, and at 12:03 p.m., sent his resignation letter to Dukes, stating that, "My last day will be September 18, 2018." (The year was apparently a typo.). (Docket Entry No. 44-3 at 4).  The letter told Dukes that Herington had "been offered a CEO role at a Private Equity owned company and will be accepting this role to advance my career."  (*Id.*). Herington's notes describe his chosen date of September 18 as "3 weeks and 1 day notice," although the parties' agreement required no advance notice of termination.  (Docket Entry No. 54-1 at 5).

At 12:11 p.m., Jukes sent an email that "acknowledged and accepted" and told Herington that "Kim [Dickens, Univar's chief people officer] will be in touch about the formalities."  (Docket

Entry No. 44-3 at 2).  Later that day, Dickens contacted Herington and told him his last day would

be August 28, 2020, not September 18, and that he would not be working or paid after August 28.

(Docket Entry 44-8 at 3–5).  Herington noted his belief that this was "not nice" and that "I would

never do that to anyone" in his handwritten log.  (Docket Entry No. 54-1 at 6).  He sent Dickens

an email stating, "I understand tomorrow will be my last day and you will be terminating me

without cause.  I accept that and acknowledge that I will prepare everything to return to the

company." (Docket Entry No. 44-4 at 3).  Dickens responded, "You resigned and that is why your

employment is being terminated.  Tomorrow is your last day." (*Id.*).

   **August 28, 2020**:   After a series of communications arranging for extended insurance

through the end of September, return of Herington's company owned property, and an exit

interview, his last day was indeed August 28.  (Docket Entry No. 54-1 at 6–7).

   **September 1, 2020**: Herington gave Univar a signed copy of the release required by the

Severance Agreement to obtain any severance that might be due.  (Docket Entry No. 44-5 at 20–

21).

   **September 16, 2020**: Univar denied Herington's severance claim.  (Docket Entry No. 44-

6).

   This litigation followed.

## II.   The Applicable Legal Standards

   "Summary judgment is appropriate only when 'the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"

*Shepherd ex rel. Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019)

(quoting FED. R. CIV. P. 56(a)).  "A material fact is one that might affect the outcome of the suit

under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury

could return a verdict for the non-moving party." *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018) (citations and internal quotation marks omitted). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place Apartments LLC*, 914 F.3d 940, 946 (5th Cir. 2019) (citation and internal quotation marks omitted). In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

The parties agree that Illinois substantive law controls. (*See* Docket Entry No. 44 at 6; Docket Entry No. 47 at 8–9). The issues are analyzed under the law and the record evidence.

## III.   Analysis

The facts and circumstances leading to Herington's last day with Univar are not contested. The issue in Herington's motion for summary judgment, is whether, under Illinois law and the terms of the parties' written severance agreement, an employee who resigns voluntarily and unilaterally decides that his last day of work will be three weeks later is involuntarily terminated

without cause for the purpose of paying a severance amount when the employer makes the resignation effective immediately. Both Herington and Univar recognize that the Illinois Supreme Court has not addressed the question. Both also recognize that the state courts have taken different approaches, and that most of the cases involve distinguishing between voluntary resignations and involuntary terminations to decide entitlement to unemployment benefits, rather than to a lump-sum severance payment that is 1.7 times an executive employee's annual salary.

This court's task is to "make an *Erie* guess and determine, in [its] best judgment, how [the Illinois Supreme Court] would resolve the issue if presented with the same case." *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007) (citation omitted). Illinois has addressed how courts should interpret contracts. In Illinois, as in many states, including Texas, "[t]he primary goal of contract interpretation is to give effect to the parties' intent." *Joyce v. DLA Piper Rudnick Gray Cary LLP*, 888 N.E.2d 657, 662 (Ill. App. Ct. 2008). A court must "interpret[] the contract as a whole and apply[] the plain and ordinary meaning to unambiguous terms." *Id.*

Herington argues that under Illinois law, the court should treat Univar's decision to accept his resignation but end his employment three weeks before his proposed last date as a termination without cause, triggering his right to the severance payment. Herington relies on *Barnes v. Neuromark*, No. 08 C 162, 2008 WL 5100356 (N.D. Ill. Nov. 25, 2008), but the bearing of that case on this one is not clear. In that case, the parties' written severance agreement required that the employer and the employee give a 30-day notice for terminations for cause or good reason. *Id.* at *1. It is not clear whether a mandatory 30-day notice period existed for terminations without cause or for voluntary resignations. When the employer fired the employee 3 weeks after he resigned, but before the end of the employee's 30-day notice period, during which he was still working for the employer, the employer "beat [the employee] to the punch by firing him before

12

his resignation was effective," and therefore had to pay him a $60,000 severance benefit, representing 6 months of salary. *Id.* at *4, 7. In this case, by contrast, there was no notice period required, Herington did not continue to work for Univar after the last day, and the severance he demands is 1.7 years of his annual salary. The *Barnes* court's ruling based on the facts and circumstances of the severance agreement in that case does not dictate the result either Herington or Univar wants here.

An Illinois appellate court case, *Tate v. Wabash Datatech, Inc.*, 497 N.E.2d 1342 (Ill. App. Ct. 1986), involves very different facts as well. In *Tate*, the employee and employer had a written agreement that the employer would pay full salary and benefits for one year after involuntary termination. *Id.* at 1343. The employee did not resign or stop work for the employer but accepted another job offer and was put on that company's payroll. *Id.* at 1344. The employee continued working for the employer, "did not abandon or relinquish his position," and there was no evidence that being placed on the other company's payroll caused him to stop performing his duties for the employer. *Id.* at 1345. The employer learned of his search for a new job and terminated his employment. *Id.* at 1344. The court found that he was involuntarily terminated and entitled to the one year of salary and benefits. *Id.* at 1344–45.

In *Tate*, unlike the present case, the employee never resigned or indicated an intent to so on any specific date. The employer's action was anticipatory and unilateral. In the present case, Herington moved first. He resigned, proposing an effective date three weeks later. Univar accepted his announced resignation effective immediately, and he did no further work.

Cases from Vermont, Virginia, Utah, and Pennsylvania examine similar issues in the unemployment benefits context. In *Kelley v. Dep't of Labor*, 101 A.3d 895 (Vt. 2014), an employee was terminated four days into a required three-week notice period. *Id.* at 896. A referee

13

for unemployment benefits conducted an administrative hearing and held that she did not leave her employment voluntarily because her employer discharged her before her notice period had ended despite having previously accepted her notice of resignation. *Id.* The Vermont Supreme Court upheld the decision, recognizing that "[w]ere it not for employer's action on September 3, the employment relationship would have continued until September 19, and claimant would have voluntarily left her employment on that date." *Id.* at 898; *see also Actuarial Benefits & Design Corp. v. Va. Emp. Comm'n*, 478 S.E.2d 735, 738 (Va. Ct. App. 1996) ("A claimant who gives notice of his or her resignation and is fired during the notice period and is not paid for the remaining portion of the notice period is considered involuntarily discharged." (citations omitted)); *Adams v. Bd. of Review of Indus. Comm'n of Utah, Dep't of Emp. Sec.*, 776 P.2d 639, 641 (Utah 1989) ("[S]eparation from employment is involuntary when the employer refuses to honor a notice period following resignation." (citation omitted)); *Wert v. Unemployment Compensation Bd. of Review*, 41 A.3d 937, 939 (Pa. Commw. Ct. 2012) (similar).

Administrative agencies take different approaches as well. The Texas Workforce Commission recognizes:

> that two weeks' notice is standard in most industries. If the employee gives notice of intent to resign by a definite date two weeks or less in the future and [the employer] accept[s] the notice early at [its] convenience, it will be regarded as a resignation, not a discharge. If more than two weeks' notice is given, but [the employer] wait[s] until two weeks or less before the effective date of resignation to accept the notice early, then [the employer] would have a good chance of having [the Commission] regard the work separation as a resignation, although not all claim examiners and hearing officers agree. Also, if the employee gives more than two weeks' notice, and [the employer] accept[s] it more than two weeks in advance, but [the employer] pay[s] wages in lieu of notice for the rest of the notice period, then the situation will still be judged a quit, not a discharge. However, if more than two weeks' notice is given, and [the employer] accept[s] the notice more than two weeks in advance without paying wages in lieu of notice (payment for a notice period not worked is not required unless such a payment is promised in writing), the situation is likely to be considered a

> discharge, with the burden of proof falling squarely on [the employer]  to prove misconduct connected with the work if [the employer] feel[s] that the claimant should be disqualified from UI benefits.  Much would depend upon the individual facts in the case.

Texas Workforce Commission, *Types of Work Separation*, https://tinyurl.com/2p8ath47 (last visited Jan. 28, 2022).  The Illinois approach to unemployment benefits is similar.  In *Randell D. Ivy v. Bd. of Review*, a claimant gave two weeks' notice that he was leaving, but his employer told him to leave immediately.  Because the employee "was willing to work until the effective date of his resignation," he "did not have the choice of remaining at work at the time he ceased working." Illinois Dep't of Emp. Security, *Illinois Unemployment Insurance Law Handbook*, MC-31 (Jan. 2022), https://tinyurl.com/yckj4m49.  In other cases, claim adjudicators have held that "where the claimant has given less than two weeks' notice," claim adjudicators view the "claimant's voluntary leaving [as] merely accelerated." *Id.* at MC-32.  Claim adjudicators have found exceptions "where it appears the notice period is merely a formality and there is no real intent to continue working." *Id.* at MC-33.

Again, these approaches are different from the facts and issues presented here.  As the Texas Workforce Commission recognized, "[m]uch would depend upon the individual facts in the case."  Texas Workforce Commission, *Types of Work Separation*, https://tinyurl.com/2p8ath47 (last visited Jan. 28, 2022).  The Texas Workforce Commission also notes that an employer can make sure that a resignation accepted more than two weeks earlier than the employee's notice called for is treated as a resignation and not a termination by paying wages in lieu of notice for the rest of the notice period, but "payment for a notice period is not required unless such a payment is promised in writing." *Id.*  In this case, not only is there no notice obligation in Univar's policies or the Severance Agreement, there is also no written promise to pay compensation for a notice period not worked.

15

The fact that this case involves severance, not unemployment benefits, is important.  The opinion in *Bradshaw v. Cedar Rapids Airport Comm'n*, 903 N.W.2d 355 (Iowa Ct. App. 2017), is instructive in pointing this out.  In *Bradshaw*, an airport employee had an at-will employment agreement with a 30-day notice requirement for voluntary resignations.  *Id.* at 358.  In the event of involuntary termination, the employee was entitled to twelve months' salary severance pay.  *Id.* The employee gave the airport 60 days' notice of intent to resign, and the airport accepted the resignation 30 days earlier, at the end of the parties' required notice period.  *Id.* at 358–59.  The court held that the employee was not entitled to the severance payment because it was the employee who "intended to completely sever the employer-employee relationship and who communicated his intent to completely sever the employer-employee relationship."  *Id.* at 362.  As the court explained:

> Our conclusion best gives effect to the parties' intended purpose. . . .
> [T]he agreement evidences the parties' intent to provide [the employee] with additional compensation in the event the [the employer] decided to terminate his employment against his will (and not for any disqualifying reason) where he could potentially find himself unemployed or underemployed.  There is nothing in the text of [any provision] of the employment agreement that evidences the severance pay provision was intended to provide [the employee] with bonus or additional compensation in the event he accepted other employment and resigned his employment with the [the employer].

*Id.* at 362–63.  *Cf. Miller v. Help At Home, Inc.*, 186 S.W.3d 801 (Mo. Ct. App. 2006) (an employee quit her job and was not involuntarily terminated when her employer stated that her last day would be before her two weeks' notice period had ended); *Guy Gannett Pub. Co. v. Maine Emp. Sec. Comm'n*, 317 A.2d 183, 187 (Me. 1974) (a resignation could not be withdrawn after notice but before the effective date).

16

Importantly, the *Bradshaw* court recognized the differences between its ruling and the general rule in the unemployment benefits context that "when an employee gives notice of resignation and the employer terminates the employment relationship prior to the end of the notice period, the employee is not disqualified from receiving unemployment compensation benefits at least through the end of the notice period." *Id.* at 361 (citation omitted). The court noted significant distinctions between the statutory unemployment benefits context and a large lump-sum contractual severance payment. Unemployment compensation statutes and regulations are construed liberally in favor of the employees. A contract is construed to give effect to the intent the parties expressed in the document. *Id.* at 361–62.

The cases, including in Illinois, require a court to look at the terms of the parties' agreement and interpret them to give effect to the parties' intent, as evidenced by the terms in light of the circumstances. *See Johnson v. Ill. Alcohol & Other Drug Abuse Prof. Cert. Ass'n, Inc.*, Nos. 4-18-0562, 4-18-0575, 2019 WL 2564112, at \*7 (Ill. App. Ct. June 20, 2019) (the court considered company policies and the circumstances in which an employee stated that he intended to resign to determine whether that was a voluntary resignation); *Rohrback v. Ill. Dep't of Emp. Sec.*, 835 N.E.2d 955, 962 (Ill. App. Ct. 2005) (stating the Illinois rule that "if a public officer submits a resignation that, by its terms, is effective *immediately* or on a *future date*, the resignation is an unalterable fact and the officer cannot withdraw the resignation and cannot negate it by continuing to perform the job" (emphasis in original)); *see also In re TexX Biopharma, Inc.*, C.A. No. 12–2431, 2012 WL 3562406, at \*7 (E.D. Pa. Aug. 20, 2012) (interpreting an employment agreement under Delaware contract law and considering the surrounding facts and circumstances to determine whether the employee resigned or was terminated).

Under the Severance Agreement here, termination by Herington or Univar could occur at any time and without advance notice. (Docket Entry No. 44-2 at ¶ 2). "[U]nless explicitly set forth in Section 3," Herington has no rights to receive payments or benefits. (*Id.* at ¶ 3). Section 3 specified two scenarios in which severance is due: (1) Univar terminated Herington's employment without cause; or (2) Herington terminated Herington's employment with good reason. The Agreement did not contain the terms "resign," or "involuntary termination," and did not define "terminate." *See Covinsky v. Hannah Marine Corp.*, 903 N.E.2d 422, 427 (Ill. App. Ct. 2009) (when the contract does not define a term, a court "must give it its common and generally accepted meaning"). The common meaning of "terminate" applicable in this context is "to put an end to; to bring to an end." *Terminate,* BLACK'S LAW DICTIONARY (11th ed. 2019). The issue is whether Herington or Univar brought an end to Herington's employment—whether Herington voluntarily resigned or whether Univar involuntarily ended his employment.

Herington's August 27, 2020, letter made it clear that he was choosing to end his executive position at Univar. He made it clear that he was "resigning," and that he would be accepting a new executive position at a different company. Although he desired to "make the transition as smooth as possible," there was no contractually required advance notice period to end his employment, by either him or Univar. Herington specified his intent to have his last day a little three weeks past his notice of resignation, but he explicitly stated on the date he gave his notice that he intended to end his employment with Univar and work for another employer. Herington's announced resignation was not an offer that was contingent on Univar's acceptance, or a negotiation over proposed terms. Herington resigned. He did so without any expectation of getting a severance bonus. The parties had an agreement that allowed Herington to resign without advance notice and without entitlement to a severance bonus. The fact that Univar made the resignation

18

effective the following day rather than on Herington's preferred three-week-later date did not,

under the circumstances, convert that resignation into a termination, or make Univar rather than

Herington the one who ended the employment.  Herington made that choice, and he did so knowing

that it did not come with a severance bonus for deciding to walk out the door.  The fact that Univar

decided to show him the door earlier than he anticipated, without requiring him to do any additional

work, did not make it Univar's decision to end the employment in the first place.  Herington had

already done so.

This approach is consistent with the parties' intent, as expressed in the Severance

Agreement.  The Agreement provides a severance cushion when the executive's employment is

either ended by the employer without cause, or by specified conditions so adverse to the executive

as to present him with good reason to end the employment.  Those conditions are specified: a

material reduction in the executive's salary, a material diminution in the executive's title or

responsibilities, or a transfer of the executive's primary workplace by more than 35 miles.  (*See*

Docket Entry No. 44-2 at ¶ 3.1.2).  Herington chose to resign, without any of these adverse

conditions, consistent with his own plan and without any prolonged unexpected loss of

compensation.  Univar did not provide him a reason to end his employment; Herington got a job

he liked better.  That was his choice.  Univar did not ask him to resign, but merely told him that

given his announcement, there was no need for him to provide transition work.

Herington terminated his employment, without good reason.  Under Section 3.1 of the

Severance Agreement, Herington is not entitled to severance.  The court denies Herington's motion

for summary judgment on breach of contract and finds that Univar does not owe him the severance

payment he alleges.  (Docket Entry No. 44).  Because the court dismisses Herington's breach of

contract claim, the court need not resolve whether the release Herington signed waived the claim. Univar's cross-motion for summary judgment, (Docket Entry No. 46), is moot.

## IV.    Conclusion

Herington's motion for summary judgment, (Docket Entry No. 44), is denied.  Univar's cross-motion for summary judgment, (Docket Entry No. 46), is moot.  Final judgment is entered separately on the claims and on the counterclaim with the exception of the claim Univar asserts for fees.  That claim may be asserted by motion filed under Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure no later than 14 days after judgment is entered.

SIGNED on January 31, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge